Maud Pirkl et al., Appellees, v. Nathan Ellenberger et al., Appellants.

**WILLS:** Undue Influence—Pleading—Sufficiency. A general allegation of undue influence is sufficient, in the absence of a motion for more specific statement. **1**

**FRAUD:** Pleading—Conclusions of Law. Principle recognized that a general allegation of fraud amounts to no more than a conclusion. **2**

**APPEAL AND ERROR:** Assignment of Error—Sufficiency. An assignment of error will be disregarded which fails to point out in some fairly definite way *wherein* the lower court committed error. Counsel wholly misses the rules when he compels the court to speculate or to make an independent examination in order to determine the precise point relied on for reversal. **3**
    PRINCIPLE APPLIED: An assignment was: "The court erred at Ab. page 57, line 22, Ab. 58, line 6, and again at Ab. page 57, line 29." *Held*, insufficient to present any error.

**WILLS:** Undue Influence—Evidence—Sufficiency. Evidence evincing unusual activity on the part of the beneficiaries of a will in procuring its execution reviewed, and, in connection with the inequalities of the will, held to create a jury question on the issue of undue influence. **4**

**WILLS:** Undue Influence—Evidence—Unequal Distribution. Principle recognized that inequality of distribution among those equally entitled to be remembered by testator may be a very **5**

material factor in determining whether the will in question expresses the testator's will.

WILLS: Undue Influence—Fiduciary Relation—Testamentary Gifts
6   —Presumption and Burden of Proof. Gifts *inter vivos*, when fiduciary relations exist between donor and donee, are presumed to have been brought about by means of the undue influence of donee. *This rule has no application to testamentary gifts.*

*Appeal from Johnson District Court.*—RALPH P. HOWELL, Judge.

SATURDAY, MAY 12, 1917.

ACTION involving the contest of a will, based on the ground that the same was procured by undue influence. Verdict and judgment setting aside the will. Defendants, proponents, appeal.—*Reversed.*

*John J. Ney,* for appellants.

*Dutcher & Davis,* for appellees.

GAYNOR, C. J.—This action is brought to set aside the probate of an instrument purporting to be the last will of one William Ellenberger, Sr., and to have the instrument declared of no force and effect. On the 1st day of May, 1914, a paper purporting to be the last will and testament of William Ellenberger, Sr., was filed for probate in the district court of Johnson County. Thereafter, on the 10th day of February, 1915, this instrument was admitted to probate and duly probated, and William Ellenberger, Jr., appointed executor. On the 11th day of February, 1915, Maud Pirkl, Mary Lenoch and Hannah Evans, daughters of the said William Ellenberger, Sr., filed their petition in the same court, alleging that the said instrument admitted to probate and probated is not the valid will of William Ellenberger, Sr., for the following reasons: (1) That, at the time of its execution, he was not possessed of testamentary capacity; that he was old, infirm, of unsound mind, and inca-

pable of executing a will; (2) that it was procured through undue influence exercised upon him by William Ellenberger, Jr., and Nathan Ellenberger, his sons; (3) that the paper purporting to be his will was obtained by fraud and deceit exercised by the same parties.

William Ellenberger, Jr., and Nathan Ellenberger were made defendants in this proceeding. At the conclusion of the evidence, the issue as to want of testamentary capacity and unsoundness of mind was withdrawn from the consideration of the jury, on motion of defendants. The cause was submitted on the issue of undue influence alone. The jury returned a verdict for the plaintiffs, finding the will procured through the undue influence of William Ellenberger, Jr. Judgment was entered upon this verdict, setting aside the will and its probate, and entering judgment against defendants for costs. From this, the defendants appeal.

Defendants have assigned 68 grounds for reversal. In each distinct assignment, they claim that the court committed some error to their prejudice. The first error assigned relates to the action of the court in the making of the issues in the cause. There is no merit in appellants' contention on this assignment. The issues were simply and fairly presented, and as fully as the plaintiffs were required to make them, under the law. Under our system

1. WILLS: undue influence: pleading: sufficiency.

of pleading, ultimate facts alone are required to be stated; ultimate facts which are susceptible of proof by substantive evidence; ultimate facts which, if proven, entitle the party to the relief prayed for. The pleader is not required to plead the facts or the circumstances or the evidence by which he intends to establish the ultimate fact. The thought of the defendant seems to be that a pleading alleging that the will was procured by undue influence is not sufficient, especially if it be intended to establish that fact by proof of fiduciary

relationship; that this relationship should be alleged, and that such undue influence was the result or brought about by the existence of such relationship. There is nothing in this contention of the defendants. It is true that, on motion for a more specific statement, the plaintiffs could have been required to more specifically state their charge of fraud. When fraud is charged, the ultimate facts which constitute the fraud should be set out, that the court may know on what the party claims the fraud rests; what constitutes the fraud. The mere charging of fraud, without further allegation, is not enough to raise the issue. But no motion for a more specific statement was made. Further than that, on this point the defendants were not prejudiced, for the reason that the court in its instructions practically withdrew from the consideration of the jury any question of fraud, submitting the case upon the one question as to whether or not the will was produced by, and was the result of, undue influence exercised by William Ellenberger, Jr., upon the testator. Finally, issue was joined on the allegation of the petition. The cause was tried and submitted upon the theory that defendants had filed a general denial. The court instructed the jury upon that theory. This disposes of the first error assigned.

2. FRAUD: pleading: conclusions of law.

Errors 2, 3, 4, 5, 6, 7 and 14 all relate to alleged errors in the admission and rejection of testimony. These errors are not argued, nor does counsel call our attention to any specific error committed by the court in this respect. There is a total failure to comply with the rules of this court. As to this complaint, it must be ignored. The following is a fair sample of the manner of assignment: "Assignment of Error. Court erred at abstract page 57, line 22; abstract 58, line 6; again at abstract 57, line 29," and so on. If we were disposed to waive the rule and examine

3. APPEAL AND ERROR: assignment of error: sufficiency.

the abstract for the purpose of ascertaining whether there was error, we are clearly relieved of this burden by the generous concession of counsel in argument that these objections are to the mode and manner of trial, rather than to isolated instances of erroneously admitting or excluding evidence. We pass these assignments, for the reason that they are not presented as the rules of procedure of this court require.

The balance of defendants' complaint relates to the action of the court in overruling defendants' motion for a directed verdict at the conclusion of the evidence; to errors alleged to have been committed by the court in the giving and refusing of instructions; and to the ruling on the motion for a new trial. These are fairly presented and argued, and to them we turn our attention.

First, to the motion for a directed ver-

**4. WILLS : undue influence : evidence : sufficiency.** dict: The will in question was made on the 25th day of September, 1909. The testator at that time was about 69 years of age, in feeble health and practically blind. He died about the 6th day of April, 1914. He left surviving him three daughters, the plaintiffs in this suit, and the two sons who are made defendants. The will, after providing for the payment of his debts and funeral expenses, recited:

"I give, devise and bequeath to my daughter, Hannah Evans, $1,000; to my daughter, Maud Pirkl, $1,000; to my daughter, Mary Ellenberger (Lenoch), $1,000, and 3 milch cows, her choice of the herd.

"Next I give, devise and bequeath all the residue of my estate, both real and personal, of which I may die seized or possessed, to my two sons, William and Nathan, equal shares."

At the time of the making of the will, the old gentleman was possessed of a considerable estate, both real and personal property. The real estate consisted of about 300

acres, more or less. The exact amount of personal property is not shown, but it appears to have been considerable at that time. His wife died in November, 1905. She appears to have been the dominating spirit in the business life of the family. At the time of the trial, the oldest son, William, was 41 years of age; Nathan, 35; the daughter Hannah Evans, 45; Maud Pirkl, about 36; and Mary Lenoch, nee Ellenberger, about 24 years of age. The trial was had in 1915. After the death of his wife, the old gentleman seems to have retired practically from an active business life, and turned over the management and control of his affairs to his boys, defendants in this suit. At the time of the making of the will, his daughters were all married, except Mary. Mary and the two sons constituted his household. Neither of the sons was married. Mary, the youngest, married soon after her father's death. About June 1, 1909, shortly before the will was made, the old gentleman went to March Hospital and had a surgical operation of some sort performed on his eyes. There is some controversy as to the extent of his blindness, but the record tends to show that he was practically blind. He returned from the hospital without being relieved to any considerable extent.

On the 25th of September following, the record tends to show that William Ellenberger, Jr., requested his sister Mary to leave home and go for a visit to the home of one of the neighbors. Thereafter, William took a horse and buggy and drove to the home of one H. A. White, a carpenter, living at North Liberty, and, having found White after some search, brought him to his father's home. Upon his arrival, White prepared, and William Ellenberger, Sr., executed, conveyances of all his property to William Ellenberger, Jr., and his brother Nathan, and at the same time prepared, and the old gentleman executed, the will in controversy. White arrived at the home of the senior Ellenberger sometime towards evening, and remained there until

after supper. During that time, the deeds were prepared, conveying all his property to these boys. The old gentleman was practically blind. It does not appear who furnished the blanks for the making of the deeds, or the paper for the preparation of the will. It is not an unfair inference to say that they were furnished to White at that time and at that place for use by someone. After supper, the deeds were left lying on the table where they had been prepared, and William Jr. took them and placed them in a receptacle, and kept them there until after the old gentleman's death; then placed them on record. William Jr. thereafter claimed that he and his brother owned all the property belonging to the old gentleman. After supper William Jr. drove White back to his home and paid him for his services. It appears that Mr. White was not acquainted with the older gentleman, and had never visited his home, and had been at his place only twice before. Some years had intervened between the visits. The will was taken by White and subsequently filed for probate. The deeds were made first. If what transpired there on that night be upheld, the old gentleman parted with substantially all his property to these boys. Thereafter he had nothing, and left nothing with which to pay the bequests to these daughters, except that the record shows that there were two certificates of deposit, of $500 each, in certain banks in the name of William Ellenberger. This money was deposited by William, Jr., and the certificates taken in the name of William Ellenberger. They had been renewed by William Jr. several times. On the trial, however, William Jr. disclaims owning these certificates, but it is true that he had claimed to own all the property possessed by the old man at the time of his death. There is some evidence to the effect that William and Nathan both claimed all the property at the time the father died, and that he had absolutely no property after the execution of the deeds, either real or

personal.    The record discloses that the father was on friendly terms with all his children.

What happened at the time White was there and made these instruments is not disclosed by the record.    It is veiled in darkness.    What was said between White and the old gentleman is not for us to know.    White, a stranger, came to this sick and blind old man; came through the procurement of these beneficiaries.    Papers were produced from somewhere and by somebody.    William disclaims having anything to do with the making of these papers.    He admits that he knew what was to happen when he found and brought Mr. White to his father's home.    Yet he claims he took no part in what transpired at the home.    Though he knew that White was to execute a will, he says he knew nothing of the execution of the will until after his father's death.    These are some of the prominent facts disclosed in this record and exposed to the jury's view.

Though we recognize the right of a testator to make such disposition of his property as he sees fit, yet the inequality in distribution among those who are equally entitled to his beneficence is a circumstance to be considered by the jury in determining whether or not the disposition actually made expressed the will of the testator.    This is bottomed on the thought that normal men, uninfluenced, do not, ordinarily, unfairly and unjustly distribute their property among the natural objects of their bounty.    Proof of inequitable distribution is only a circumstance in the chain of evidence bearing upon the ultimate fact of undue influence exercised upon the mind.    Upon this point see *In re Estate of Townsend*, 122 Iowa 246.    In view of the fact that this case must be reversed for other reasons, we refrain from further comment upon this testimony.    It is sufficient to say that, in our judgment, there was a fair question for the jury upon the question of undue influence,

5. WILLS: undue influence: evidence: unequal distribution.

and that the court did not err in overruling defendants' motion for a directed verdict.

6. WILLS: undue influence: fiduciary relation: testamentary gifts: presumption and burden of proof.

The next error involves the refusing of instructions asked and the giving of instructions by the court on its own motion. These may be considered together, and the consideration of them disposes of the last proposition, involving the ruling on the motion for a new trial. The court in its third instruction said to the jury:

"The plaintiffs claim that there were 'fiduciary relations existing between William Ellenberger, Sr., and William Ellenberger, Jr.' Now you are instructed that 'fiduciary relations' and 'confidential relations' are ordinarily used as convertible terms, and have reference to relationship of blood, business, friendship or association, in which the parties repose special trust and confidence in each other, and are in a position to have and exercise, or do have and exercise, influence over each other, and is more particularly applicable where one of the parties to such relation has, by his hold upon the affection, trust and confidence of the other, obtained dominating influence over him. You are instructed that the burden of proof is upon the plaintiffs to establish the fiduciary relations   *   *   *   by a preponderance of the evidence, and if they fail to do so, then it will be unnecessary for you to consider the case further, and you should return a verdict for the defendants; but if they have done so, then it will be necessary for you to continue further, under the instructions hereafter given."

In the next instruction, the court proceeds to tell the jury, and rightly so, that a parent has a right to dispose of his property as he thinks best; that he may deed it or will it to persons outside the family; may give it to one or more of his children and ignore the equal, and often superior, rights of others; that no presumption arises that

he was unduly influenced in so doing. The court then proceeds to say that, if there is a fiduciary relation existing between such parent and child, the law then presumes that such will was procured through the undue influence of such child, and the burden of proof is on the child to overcome this presumption by a preponderance of the evidence, and to establish affirmatively that the bequest was not the result of undue influence exercised.

It is hard to reconcile these two instructions. If it be true, as the court told the jury in the first place, that "fiduciary and confidential relations" are ordinarily used as convertible terms, and that, when fiduciary relations. were spoken of, reference is had to relationship of blood, business, friendship or association, out of which special trust and confidence arises, and by reason of which the parties are in position to have and exercise influence over each other, we hardly see what protection there is to the favorite son, to the friend of a lifetime, to the trusted business associate, from the imputation of undue influence impeaching his integrity, and from suspicion that the gift was not the product of a generous impulse expressing the will, of his benefactor. The closer the relationship, the closer the tie that binds; the greater the confidence and esteem,. the more certain this rule would make it. that the bequest was not the free and voluntary act of the giver. In further instructions given, the court emphasized the thought that, if fiduciary relationship existed between William Sr. and William Jr., at the time of the execution of the will, the burden was on the defendants to show that the will was not procured through undue influence exercised by William Jr.

Authority for the phrasing of these instructions may be found in *Curtis v. Armagast,* 158 Iowa 520. In that case, however, the court was dealing with a gift *inter vivos.* In that case, the rule as to the burden of proof upon the

showing of fiduciary relationship was recognized and approved. The rule and its application to contracts *inter vivos* secures recognition through the fact that the living do not part with their property, even to their dearest friends, during their lifetime, without at least a fair consideration. Where one sustaining fiduciary relations to another secures from the other a gift or donation, or a contract greatly to the disadvantage of the giver *inter vivos,* the law raises a presumption that the gift would not have been made, or the contract entered into, through the free and voluntary volition of the giver. This presumption calls upon the beneficiary to purge himself at least from a suspicion of improper influence in bringing about the gift. It is common experience, and courts recognize this, that owners of property do not readily part with their property, by way of gift, during their lives.

In contemplation of death, however, the transaction wears a very different aspect. The property must be parted with when that event arrives. It is most natural to select for benefaction those who are nearest and dearest, whether related by blood, business, friendship or association. Men do not, in contemplation of death, ordinarily give their earthly possessions over to their enemies, nor to those in whom they repose no trust and confidence. Indeed, the closer the relationship, the greater the bond that binds, the more certain is the mind that the testator chose intelligently the objects of his bounty. That he chose one who is dear to him and excluded one who ought to be equally dear, does not cast upon the beneficiary the burden of showing that he did not procure the benefaction by the use of undue influence.

These instructions would justify the jury in finding the will procured by undue influence, upon the basic fact alone of the relationship existing between the father and these sons, without proof of any substantive fact or circum-

stance tending to show that undue influence was in fact exercised by these boys. From these instructions it follows that, unless the defendants were able to show affirmatively by a preponderance of the evidence that they did not procure the making of this will, by the exercise of such influence over the old man as overcame his own judgment and his will, and made the will express not his, but their, wish in the disposition of his property, the will could be found to be the result of undue influence.

We have had occasion to review recently the matter here under discussion. The opinion was written by Judge Ladd. *Graham v. Courtright,* 180 Iowa —. In that case, it was said:

"The doctrine that undue influence is to be presumed as between parties *inter vivos,* dealing with each other, when fiduciary relations exist, has no application to testamentary gifts."

And it was further held that proof of fiduciary relationship did not shift the burden of proof upon the beneficiary to purge himself of the charge of having exercised undue influence in procuring the benefaction. We think the court erred in these instructions hereinbefore set out, and for that reason the case must be and is—*Reversed.*

LADD, EVANS and SALINGER, JJ., concur.