ISABEL ALBRIGHT et al., Appellants, v. LYDIA MOECKLY et al., Appellees.

**WILLS: Validity—Undue Influence—Declarations of Beneficiary.** Declarations of a testamentary beneficiary which tend to show that he employed undue influence on testator in order to secure the execution of the will are inadmissible when the will carries separate and independent bequests to beneficiaries other than the declarant. (See Book of Anno., Vol. 1, Sec. 11846, Anno. 245 *et seq.*)

**WILLS: Testamentary Capacity.** A showing that a testator was unable to transact business generally, was of advanced age, was suffering a loss of memory, and was afflicted with senile dementia, does not necessarily generate a jury question on the issue of testamentary capacity. (See Book of Anno., Vol. 1, Sec. 11846, Anno. 39 *et seq.*)

Headnote 1:   22 C. J. p. 454; 40 Cyc. p. 1163.   Headnote 2:   40 Cyc. pp. 1004, 1007, 1008, 1013, 1018.

Headnote 1:   38 L. R. A. (N. S.) 732; 28 R. C. L. 401.   Headnote 2: 27 L. R. A. (N. S.) 2; L. R. A. 1915A, 444; 28 R. C. L. 85-94.

*Appeal from Polk District Court.*—LESTER L. THOMPSON, Judge.

NOVEMBER 16, 1926.

This is a will contest. Judgment was entered on a directed verdict in favor of proponent. Contestants appeal.—*Affirmed.*

*Dale & Harvison,* for appellants.

*Miller, Kelly, Shuttleworth & McManus,* for appellees.

MORLING, J.—A former appeal of this case is reported in *In re Estate of Sexauer,* 198 Iowa 1378.

I. The only question in connection with the claim of undue influence that need be noticed is the ruling of the court sustaining proponent's objection to contestants' offer to prove conversations between one of the beneficiaries (Jacob) and others, after the execution of the will, in which he admitted that it was through his importunities and because of his need that the will was made. By the will, after the making of certain bequests, the residue was required to be divided into seven and one-half shares. One of these shares was given to Jacob. Each of the six remaining shares and the one-half share were given to other severally named beneficiaries. The bequest to the residuaries was not to them jointly. Jacob was not the principal beneficiary. He was one of a number. His declarations were not a part of the *res gestae.* The law is settled in this state that such declarations are not admissible. *James v. Fairall,* 154 Iowa 253, and cases cited. There is no evidence of the exercise of undue influence or duress.

1. WILLS: validity: undue influence: declarations of beneficiary.

II. The principal question is whether there is such evidence of mental disability as to require the submission of the case to the jury. The will was made September 15, 1920. Testa-

trix died May 9, 1921. At the time the will was made, she was about 87 years of age. She had given birth to twelve children, of whom two predeceased her. Her husband survived her. The estate consisted principally of 80 acres in Polk County, acquired in early life. There is evidence tending to show that decedent had expressed her desire that her property should be divided equally among her children, and that some of the older children had remained at home for a number of years after they became of age, receiving no compensation other than clothing and a little spending money; that they and one who worked out helped in early years in maintaining the family and paying for the land; that some of them were without means,—inferentially that there is inequality. It is shown without dispute that the eyesight of testatrix was quite poor. The only evidence immediately relating to the execution of the will is that offered by proponents. The witnesses to the will were the attorney who drew it, Jesse A. Miller, and F. J. Alber. Mr. Alber says that testatrix and Jacob came to his office, and she asked him if he "would not go up and be a witness. She said she wanted to make a will." Witness asked her if she had any particular attorney she wanted to go to, and she said "Yes," she wanted to go to Judge Miller's office. They went over to Judge Miller's office, and witness told Judge Miller that she wanted to make a will. There were just the three of them in the office: testatrix, Judge Miller, and Witness Alber. Witness went back to his own office while the will was being drawn. He returned to Judge Miller's office after the will was drawn. Witness asked testatrix if she had read the will. Testatrix said "No," the judge had read it to her. Witness asked to have the stenographer read it to her, "so grandma could understand whether it was really what she wanted. * * * Because she said she couldn't read it herself. I think she said she didn't have her glasses. I don't know whether that was the reason, and I thought it was best for her to go to work and have the other lady read it to her, so I was sure she could center her mind the second time on whether it was the way she wanted it just that way." After it was read to her the second time, witness asked testatrix if it was the way she wanted it, and she said it was. It was then executed. In signing it, her signature ran over the printed portion; and at Alber's suggestion, that page

2. WILLS: testamentary capacity.

was recopied, again read to her, and executed. Judge Miller asked testatrix what she wanted to do with the will, and she said, ''Just leave it here.'' The will was kept in Judge Miller's office until February 16th, when it was mailed to testatrix, in response to a letter purporting to be from her (though not in her handwriting), asking that it be sent to her, which was done. It was sent back to Judge Miller, with a letter purporting to be from her, though not in her handwriting, saying that she had sent it to him because she wanted to change it, and wanted one of the devisees to have the same as the other girls. The letter said, ''You fix her full share, and keep my will.'' A codicil was drawn and sent to her, but was not executed. The will, however, when returned to Judge Miller had a lead pencil change (not in her handwriting), from a half share to a whole share to one daughter.

A physician who had been serving her for 18 years testified that testatrix would come in the evening, asking for medicine, when she had had medicine in the morning; that for the last year she was quite childish and forgetful; that she had symptoms of senile dementia; that ''within the last six months of her life, or such a matter,'' he did not think she would be capable of transacting business of importance. Another physician who had attended her testified that senile dementia existed possibly four years before her death, blunting or crippling the mental faculties, affecting, but not necessarily wholly destroying, memory. He testified that for the last six months there was some of her business that she could transact. The only line he had any knowledge of was her dealings with him. He said she would have to have some assistance in making change, on account of her sight. He would not say that she had lost the ability to write, but that she had lost the ability to see. A lay witness testified that he did not think she was capable of doing business about the time the will was made, but he did not testify to the facts upon which he based his conclusion, other than that she did not recognize him, and in a little time after being told who he was, she would take him for somebody else; that one might say she was ''kind of flighty or something.'' Other witnesses testified to her not recognizing her children, and to her saying that she was forgetful; that she could hardly remember her children any more. There was evidence that some of her kitchen

utensils were painted, and that testatrix said they would last longer. A grandson testified that testatrix, the last one or two years, would not carry on a connected, intelligent discussion with him. No witness, except as mentioned, expressed an opinion on her mental competency.

Ability to transact business generally is not essential to testamentary capacity. Advanced age, failure of memory, senile dementia not shown to render the testatrix of insufficient mental capacity to understand the nature of the act, to recollect the extent of her property and the natural objects of her bounty and their claims upon her, and to comprehend the manner in which she wishes her property distributed, childishness, mental weakness, old age, are not of themselves sufficient to deprive her of testamentary capacity. The term "senile dementia" is used by one of the physicians as meaning "a gradual deterioration of the mental powers," and by the other as indicating a deterioration of certain parts of the brain. It is significant that no witness, expert or lay, expresses the opinion that testatrix was of unsound mind at the time the will was made. The evidence that in the fall of 1920 some of the cooking utensils were painted, and that testatrix said they would last longer, arrests attention. One witness testified:

"Well, she had a little paint left after she fixed up the old cupboard, and she concluded to put it on the outside of some of these cooking utensils, didn't she? A. I suppose she did; it was paint. I didn't see her paint the cupboard, but she painted the cooking utensils. * * * She intended to use them; she had them sitting in there to dry. Q. You never saw any cake in any of them or any pie in any of them like that? A. No, there was not anything in them."

Another witness says he found a frying pan which had been painted on the inside, and some cake pans and pie pans and a tray; that testatrix said they would last longer if they were painted. The last time he saw them, they were piled in a box. The discovery of the fact seems to have excited some amusement, but no witness connects the incident with mental unsoundness. While one witness says that they were not getting worn out, and that testatrix used them, and intended to use them, there is no evidence of what use, if any, was in fact made of them. Contestants had the burden of showing mental incompetency. We

do not think that a verdict of testamentary incapacity could be founded upon either this isolated circumstance or on that and the others which have been referred to, in the light of the entire record, especially in view further of the uncontradicted evidence of what occurred at the time the will was made. The law governing the subject has been so fully discussed in recent opinions that further comment would be superfluous. *In re Will of Johnson*, 201 Iowa 687; *Seamans v. Gallup*, 195 Iowa 540; *In re Estate of Koll*, 200 Iowa 1122; *In re Estate of Lockmiller*, 199 Iowa 358; *In re Will of Richardson*, 199 Iowa 1320; *In re Estate of Shields*, 198 Iowa 686; *Liddle v. Salter*, 180 Iowa 840; *Morrison v. McLaughlin*, 191 Iowa 474; *In re Estate of Armstrong*, 191 Iowa 1210; *Bales v. Bales*, 164 Iowa 257; *Wendt v. Foss*, 161 Iowa 122.

The judgment is—*Affirmed.*

DE GRAFF, C. J., and EVANS and ALBERT, JJ., concur.